UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ROBERT CARSON, | CASE NO. C18-5858 MJP |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

This matter was tried before the Court without a jury on July 15-16, 2021. Having heard all the testimony at trial, reviewed the admitted trial exhibits, and reviewed the trial briefs, the Court makes the following Findings of Fact and Conclusions of Law.

**INTRODUCTION**

This matter arises out of a car collision that occurred in Sequim, Washington on January 15, 2017 involving Plaintiff Robert Carson and a United States Postal Service truck driven by a postal employee within the scope of his employment. Defendant United States of America has admitted liability and apologized to Carson for the collision. The parties have stipulated to the

United States' liability. At trial, the Court was asked to assess and determine the proper amount of damages Carson sustained as a proximate cause of the collision, whether he failed to mitigate any damages, and, if so, the amount attributable to his failure to mitigate.

## FINDINGS OF FACT

**A.   Parties**

1. Plaintiff Robert Carson is a resident of Washington.

2. The United States of America is the Defendant and has admitted that the postal service worker who struck Carson's car was acting as an agent of the United States within the scope of his employment.

**B.   Stipulated Facts Regarding the Collision**

3. Carson was involved in a motor vehicle collision with a United States Postal Service employee on January 15, 2017, at approximately 1:11PM.

4. The collision occurred at the intersection of E. Washington Street and N. Rhodefer Road in Sequim, Washington.

5. The USPS employee was executing a right-hand turn from a stop sign on N. Rhodefer Road when he collided with Carson.

6. Carson was traveling east on E. Washington Street.

7. The USPS employee collided with Carson's rear passenger's side door.

8. The USPS employee was traveling approximately 2-5 MPH.

9. Carson was traveling approximately 30 MPH.

10. The United States admits that the USPS employee failed to yield the right-of-way and thus caused the collision.

11. Both drivers declined medical treatment at the scene.

**C.     Additional Facts Regarding the Collision**

12.     At the time of the collision, Carson's was driving his 1993 Geo Metro.

13.     The impact of the collision caused Carson to bounce off the steering wheel and hit the driver's side door.

14.     After the medics arrived at the scene, Carson experienced a sharp pain in his neck, which he described as feeling like two daggers stabbing into his neck. He was unable to place much weight or move in certain ways without experiencing great pain.

15.     At the time of the collision, Carson was traveling with his dog.

16.     After the collision, Carson refused to travel in the ambulance because he did not want to leave his dog behind—he believed he could not take the dog with him in the ambulance.

**D.     Treatment Immediately After the Collision**

17.     Approximately two hours after the collision, Carson drove himself to the emergency room.

18.     Carson complained of acute pain in his back, neck, and hip at the time of admission.

19.     Based on Carson's concerns about his pain, the treating physician obtained x-rays of Carson's spine that revealed no fractures.

20.     Additional CT scans were also taken at the emergency room and revealed some degeneration in Carson's spine and mild space narrowing in his spine. There were no acute cervical spine abnormalities noted.

21.     The treating physician at the emergency room diagnosed a mild cervical muscle and lumbar strain, and hip pain.

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 3

22. Carson was discharged and given a prescription for muscle relaxants and pain medicine.

23. Carson had a history of low back and joint pain prior to the collision, but it was asymptomatic before the collision. Carson's low back and neck pain was primarily muscular that would sometimes be triggered by the physical labor he engaged in for his work. He likened this pain to the kind of muscle aches one gets from engaging in a new physical activity to which one is not accustomed. These symptoms would abate after a few days and were not chronic. The back and neck pain Carson experienced after the collision was different from his prior back and neck pain because it was constant and not triggered by physical labor.

### E. Carson's Living Conditions

24. At the time of the collision Carson was living in his car near the Dosewallips River near Brinnon, Washington.

25. After the collision Carson began living in a tent at the same location on the Dosewallips. As of the trial, Carson continues to live in a tent at the same location.

26. Given where he resides, Carson is dependent on having a vehicle to attend physical therapy and medical appointments. To reach these appointments, Carson has had to travel for hours by car each way, as noted below.

### F. Post-Collision Therapy and Treatment

27. After his discharge from the emergency room, Carson participated in fifteen sessions of physical therapy at Kitsap Physical Therapy in Poulsbo, Washington from January through April 2017. The drive to Poulsbo took Carson approximately an hour and forty minutes each way.

28. Carson reported experiencing constant pain with fluctuating intensity that caused sharp stabbing pain that affected his sleep and was aggravated by movement.

29. Given the ongoing pain he was experiencing, Carson obtained an MRI at In-Health Imaging on May 1, 2017. This showed some disc abnormalities in his lumbar and cervical spine, including some degenerative changes.

30. In June 2017, Carson visited Joshua Shatsky, M.D., an orthopedic surgeon at WestSound Orthopedic in Silverdale, Washington because of the ongoing pain in his back and neck. Dr. Shatsky diagnosed Carson with cervical stenosis and ossification of the posterior longitudinal ligament.

31. Dr. Shatsky recommended a cervical fusion surgery to help alleviate Carson's symptoms. There are risks and complications from the surgery, and cervical fusion can limit mobility up to 40%. The cervical fusion would not ameliorate the lower back pain that Carson was experiencing. According to Dr. Shatsky, Carson was not a candidate for major surgery such as the cervical fusion because Carson was living in a tent at the time.

32. Carson did not obtain a cervical fusion.

33. From July through August 2017, Carson engaged in physical therapy at Jefferson Community Healthcare in Port Townsend, Washington, which was targeted at the cervical spine. Carson did not find the results of treatment to be particularly beneficial and ceased treatment. It took Carson approximately an hour to an hour and twenty minutes each way to attend these sessions.

34. Carson began physical therapy at Olympic Medical Center in Port Angeles, Washington in February and March 2018 to assist with his cervical pain. But after four sessions he was discharged after a verbal dispute with staff over an informed consent form.

1       35.     Carson then began more physical therapy at Peak Performance Physical Therapy in Sequim, Washington from October 2018 through January 2019. This therapy targeted both the cervical and lumbar spine. The results of the therapy were inconsistent, and Carson became frustrated and irritable with staff. Carson was discharged from physical therapy at Peak Performance Physical Therapy on January 19, 2018 due to a lack of progress.

        36.     On November 19, 2018, Carson began treatment with physical medicine and rehabilitation physician Wilson Chang, M.D. at Swedish Pain Services in Seattle, Washington. Carson sought this consultation to address his complaints of cervical pain, particularly since his many attempts at physical therapy had proven unsuccessful. To visit Dr. Chang, Carson had to drive to from the Dosewallips to the ferry, take the ferry to Seattle, and then ride a bus to Swedish. It took 40% of Carson's monthly income to make one visit.

        37.     Following his physical evaluation and review of the imaging, Dr. Chang concluded that Carson had chronic axial neck pain likely due to cervical spondylosis, but he could not rule out stenosis given Carson's radiating periscapular pain. He also found Carson to likely suffer from overlying myofascial pain.

        38.     Dr. Chang prescribed several different nerve pain medications in the hopes of addressing the pain complaints. Carson also continued utilizing a muscle relaxant.

        39.     When these medications did not provide relief, Dr. Chang prescribed a low dose of the opioid Tramadol. Carson reported some, but limited relief.

        40.     Throughout treatment, Dr. Chang recommended two different types of interventional spinal procedures, a steroid based injection, and a medial branch nerve block.

41. The steroid-based injection is designed to be both diagnostic and therapeutic. If pain relief occurs at the level of the spine injected with the steroid, then it confirms the location (or spinal level) of the pain. The steroid can also provide temporary pain relief.

42. The medial branch nerve block targets the joints that are believed to be arthritic and blocks the nerves connecting to those joints. Depending on if and how long the patient experiences pain relief, a physician can form an understanding of the location (or spinal level) of pain. These injections are purely diagnostic and allow the clinician to target the problematic level(s) moving forward.

43. Carson declined both procedures given his concerns about the side effects of the injections and the potential that they would not assist in remedying the pain. He was also concerned that he could become paralyzed given what he understood to be Dr. Shatsky's concerns that he was highly susceptible to become a quadriplegic. At trial, Carson credibly testified that he would now consider Dr. Chang's recommendations to help alleviate his pain.

44. On October 28, 2020, Carson was dismissed from Dr. Chang's services following a verbal dispute with staff about missed telephonic appointments that Carson did not believe he had missed.

45. On December 8, 2020, Carson presented at Sound Pain Alliance (also known as Peninsula Pain Clinic, PLLC) for a pain management evaluation. Treatment was not successful, and Carson had a difficult time getting along with staff.

46. On February 18, 2021, Carson presented at Anesis Spine & Pain Care in Olympia, Washington for a pain management evaluation. Clinicians recommended a medial branch nerve block to address the pain in Carson's cervical spine. Carson deferred this procedure. Carson received an injection of Toradol, a non-steroidal anti-inflammatory drug to treat pain.

47. Again, Carson had difficulty interacting calmly with staff and was discharged in March 2021. Carson perceived that the staff treated him poorly on account of the fact he continues to experience homelessness and is seeking treatment for pain and potentially opioid pain medications. Nothing presented at trial indicates that Carson has ever abused his medications.

48. Carson continues to seek physical and medical treatment for his neck and back pain.

**G.     Carson's Financial and Social Condition**

49. Before the collision Carson had been getting by financially. Carson had been involved in seasonal manual labor but had been unable to find consistent gainful employment. Carson made money by selling his possessions and selling other items he acquired at garage sales.

50. At the time of the collision, Carson expected to find some seasonal employment in the Spring 2018 but was unable to do so after the collision.

51. Carson had friends before the collision. After the collision, Carson has lost human friendships and connections.

**H.     Carson's Car**

52. At the time of the collision, Carson had pieced together the 1993 Geo Metro he was driving using parts from other Geo Metros in his possession. While the car was not in "good" condition, it was operable and had no wheel alignment problems.

53. At the time of the collision, Carson used his car to seek work and buy and sell goods for sale from garage sales. Carson's car was also his home—the place where he slept and

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 8

sought shelter. Given where he resides, Carson depends on a car to get around, particularly to attend medical and therapeutic appointments.

54. Carson was able to drive the 1993 Geo Metro for some time after the collision.

55. But as a result of the collision, the wheels on the car were out of alignment due to damage to the trailing arm. This caused the car to shake violently the faster it traveled, and it caused Carson to experience greater neck and back pain while driving. The misalignment also caused Carson to wear out tires every 150-300 miles. He purchased 5 new sets of tires after the collision caused by the misalignment. He testified that the cost was $150 to $300 per set of tires.

56. Carson continued to drive the damaged 2013 Geo Metro for three to four months after the collision.

57. Approximately three to four months after the collision, Carson salvaged the 1993 Geo Metro and purchased a 1987 Ford van for $600.

58. Carson and the United States agreed at trial that the fair market value of the Geo Metro involved in the collision was $1,000.

**I.    Carson's Mental Health and Barriers**

59. Carson suffers from kinesiophobia, which causes him to be guarded and fear physical movement. This has and continues to pose a significant barrier to progressing successfully with physical therapy.

60. Carson is frustrated and irritated by the lack of progress he has seen in ameliorating his pain despite his substantial commitment to seek treatment. This is exacerbated by the fact that he has spent hours traveling to and from appointments—a significant time commitment—and by the unfriendly reception he has perceived from staff members at the

various providers he has visited. As a result, Carson has difficultly interacting with health care providers who are not doctors.

61. Although Carson presented no formal diagnosis, Carson's obstinate and difficult personality traits have become exacerbated by the pain that he has endured from the collision.

62. Carson expresses great sadness at the insecurity of his current predicament of living in a tent—a living situation he has not sought out. Like most, he wants to live in a home where he can hang his hat at the end of the day. He wants privacy and to be free from the glare of prying flashlights shining into his tent in the middle of the night.

**J.     Medical Expenses and Expert Opinion**

63. Carson claims a total of $14,340.80 in past medical expenses.

64. The amount Carson claims in medical expenses excludes the expenses incurred at Peninsula Pain Clinic ($883.00) and Swedish Medical Center ($1,250.00) which were not properly disclosed per Federal Rule of Civil Procedure 37(c)(1).

65. Dr. Donna Moore performed an independent medical examination of Carson in October 2018.

66. Dr. Moore credibly opined that the past medical expenses that Carson claims were reasonable and necessary and causally linked to the car collision.

67. Dr. Moore credibly opined that the neck and back pain Carson has suffered was more probably than not caused by the car collision. Dr. Moore agreed that Carson has some underlying cervical conditions, but that these conditions were not symptomatic at the time of the collision. This is consistent with the testimony of Dr. Shatsky, who opined that Carson's back and neck pain could have been caused by the collision, not his degenerative conditions. This is also consistent with Carson's own testimony.

68.    Dr. Moore confirmed that Carson suffers from kinesiophobia, which is caused by his persistent post-collision pain, and which impedes Carson's ability to engage successfully with physical therapy.

69.    Although Dr. Moore found Carson needs for future medical treatment, she did not opine as to the costs of such treatment.

## CONCLUSIONS OF LAW

**A.    Jurisdiction and Venue**

1.    The Court has jurisdiction over this matter under 28 U.S.C. § 1346(b). Venue is proper in this Court under 28 U.S.C. § 1402(b).

**B.    Federal Tort Claims Act**

2.    Pursuant to the Federal Tort Claims Act, the United States is liable for a "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

3.    The United States has stipulated and admitted to liability under the FTCA.

4.    Carson satisfied the administrative requirements under the FTCA, 28 U.S.C. § 2401.

**C.    Negligence**

5.    Because the subject collision occurred in Sequim, Washington, the substantive law of Washington State applies. See Conrad v. United States, 447 F.3d 760, 767 (9th Cir. 2006).

6.    "In order to prove actionable negligence, a plaintiff must establish the existence of a duty, a breach thereof, a resulting injury, and proximate causation between the breach and

the resulting injury." Schooley v. Pinch's Deli Mkt., Inc., 134 Wn.2d 468, 474 (1998). Plaintiff must prove this by a preponderance of the evidence. See WPI 21.01, 21.02.

      7.      The United States admits that its employee failed to yield the right-of-way and thus proximately caused the collision with Carson's car. As such, the United States admits it breached a duty of care owed to Carson. The parties dispute the proximate cause of some of Carson's claimed medical expenses and other damages, and the amount of these damages.

      8.      Proximate cause "consists of cause in fact and legal causation." Hertog, ex rel. S.A.H. v. City of Seattle, 138 Wn.2d 265, 282 (1999). "Cause in fact concerns 'but for' causation, events the act produced in a direct unbroken sequence which would not have resulted had the act not occurred." Id. at 282-83. Legal causation involves a determination of whether liability should attach as a matter of law given the existence of cause in fact. It is a much more fluid concept that "but for" causation, grounded in policy determinations as to how far the consequences of a defendant's acts should extend. Colbert v. Moomba Sports, Inc., 163 Wn.2d 43, 51 (2008).

      9.      "The causal relationship of an accident or injury to a resulting physical condition must be established by medical testimony beyond speculation and conjecture." Miller v. Staton, 58 Wn.2d 879, 886 (1961). "A plaintiff must offer evidence that the collision was the probable cause of the condition, [and] the condition more likely than not resulted from the collision." Id.

**D.    Proximate Cause**

      10.     Carson established that his current, chronic pain was more likely than not proximately caused by the car collision. Carson testified credibly that his existing neck and back pain was not symptomatic at the time of the collision, and that the pain he experienced and continues to experience was proximately caused by the accident. Dr. Moore credibly testified

that the neck and back pain Carson has suffered and continues to suffer was proximately caused by the car collision. Dr. Moore's expert testimony confirmed that Carson's underlying cervical conditions were not symptomatic at the time of the collision but were lit up by the collision. This testimony was consistent with Dr. Shatsky's opinion that he could not rule out Carson's back and neck pain being proximately caused by the collision as opposed to his preexisting degenerative spinal disease.

11. The Court also concludes that Carson established by a preponderance that the pain and suffering, loss of enjoyment of life, and humiliation he identified were proximately caused by collision.

12. And the Court concludes that Carson established by a preponderance that the medical expenses he claims were incurred were proximately caused by the collision.

**E.      Economic Damages**

13. Economic damages are defined by statute as objectively verifiable monetary losses, including inter alia, medical expenses, and costs of replace or repair. RCW 4.56.250(1)(a).

14. Carson may recover the cost of the damage to his vehicle and the loss of use of his vehicle proximately caused by the collision. See Holmes v. Raffo, 60 Wn.2d 421, 431, 431 (1962). Or if the car is destroyed, the owner may recover the fair market value of the car, but not the loss of use. See McCurdy v. Union Pac. R.R., 68 Wn.2d 457, 469 (1966).

15. Carson may also recover the cost of reasonable and necessary medical expenses, though he bears the burden of proof that they were reasonable and necessary. Patterson v. Horton, 84 Wn. App. 531, 543 (1997). Medical bills are relevant only if "supported by additional evidence that the treatment and the bills were both necessary and reasonable." Id.

16.     Carson claims a total of $14,340.80 in past medical expenses.

17.     The Court concludes that Carson has proved by a preponderance of the evidence that his claimed past medical expenses were reasonable and necessary to treat Carson's pain proximately caused by the collision. Dr. Moore credibly attested to this fact.

18.     Carson has failed to establish by a preponderance of the evidence the cost of future medical care, though Dr. Moore did provide expert testimony on the need for future medical treatment.

19.     The Court also concludes that Carson suffered $2,500 in damages to his car as a result of the collision. The parties agreed at trial that Carson's 1993 Geo Metro had a fair market value of $1,000. Carson also provided testimony that he incurred between $750 to $1,500 to replace tires that wore out due to the wheel misalignment proximately caused by the collision. Having considered the testimony and evidence, the Court concludes that $2,500 is the appropriate recoverable amount for the cost of the new tires and fair market value of the car at the time of its salvage.

20.     In total, Carson is entitled to $16,840.80 in economic damages.

**F.     Noneconomic Damages**

21.     Noneconomic damages are defined by statute as inter alia, subjective, nonmonetary losses, including but not limited to pain and suffering, humiliation, and loss of enjoyment of life.  RCW 4.56.250(1)(b).

22.     Noneconomic damages are within the fact finder's discretion, though "there must be evidence upon which the award is based." Bunch v. King Cty. Dep't of Youth Servs., 155 Wn.2d 165, 180 (2005).

23. The Court concludes that Carson is entitled to $200,000 in noneconomic damages. The Court finds this amount reasonable and appropriate given the evidence and the parties' respective positions on the amount that should be awarded, including what has been awarded in other matters involving similar claims and damages cited by the parties.

24. Carson provided wide ranging testimony about the longstanding pain and suffering that he has experienced as a result of the collision. Carson spent hours traveling to appointments to seek therapy and assistance to remedy the pain, but to little or no avail. This exacerbated Carson's feeling of hopelessness and frustration resulting from the car collision. For three to four months, Carson's car trips themselves exacerbated that pain due to the wheel misalignment. He continues to live with back and neck pain proximately caused by the collision. And Carson faces uncertainty in the prognosis for future pain and the ability to manage that pain.

25. The collision has further diminished Carson's enjoyment of life. The collision changed and exacerbated Carson's tenuous living situation and ability to find employment. Before the collision Carson had been getting by financially. But as a result of the collision, he was unable to find employment or find garage sale items to sell for income. Carson's car on which he depended for income became painful to drive, and it no longer provided him shelter at night. Carson's days were filled with the flurry of medical and therapeutic appointments, which involved long commutes. Carson's constant pain also fueled the frustration that he felt with his lack of progress, which made him irritable and difficult, particularly around medical staff. And Carson lost friendships and human relationships as a proximate cause of the collision.

26. Carson has also ensured humiliation and a loss of dignity and humanity as a result of the collision. Carson perceives that many of the health care providers he has interacted with

see him only as someone who is homeless and seeking drugs. And yet, there is nothing in the record that indicates that Carson has ever abused his medications.

27. While the United States admonishes the Court not to attempt to solve all of Carson's personal circumstances, the Court concludes that the collision has caused significant, negative changes to Carson's personal circumstances.

28. Having considered the evidence, the Court finds an award of $200,000 in noneconomic damages appropriate for the harm proximately caused by the negligence of the United States.

**G.     Failure to Mitigate Damages**

29. To prove that Carson failed to mitigate his damages, the United States bears the burden of proving that Carson failed to exercise ordinary care to obtain medical treatment. See WPI 33.02. The United States must prove this by a preponderance. See WPI 21.05. In assessing this claim, the fact finder may consider the nature of the treatment, the probability of success of such treatment, the risk involved in such treatment, and all of the surrounding circumstances. See id.

30. The United States has not met its burden to establish that Carson failed to mitigate his damages.

31. Carson demonstrated a dogged determination to seek medical treatment for the pain he experienced after the collision. He traveled miles to attend physical therapy and to confer with different medical doctors. Carson's decision to decline the spinal fusion, the steroid injection, and the medial branch blocks were reasonable. These procedures presented significant risks and complications, and left open the distinct possibility that Carson still would have continued to experience pain from the collision. The Court therefore concludes that Carson's

FINDINGS OF FACT AND CONCLUSIONS OF LAW - 16

unwillingness to undergo these procedures was not unreasonable. See RCW 4.22.005 and 4.22.015; see also WPI 33.02.

32. The Court concludes that the United States failed to prove by a preponderance of the evidence that Carson failed to mitigate his damages. Accordingly, the Court does not reduce Carson's damages.

**H.  Summary**

33. Having considered the evidence, testimony, and argument of the parties, the Court finds and concludes that Carson has demonstrated by a preponderance of the evidence that his claimed damages were proximately caused by the United States' negligence. The Court finds and concludes that the United States has failed to prove that Carson did not mitigate his damages.

34. The Court finds and concludes that Carson is entitled to an award of $16,840.80 in economic damages and $200,000 in noneconomic damages, which totals $216,840.80.

35. Judgment shall be separately entered.

The clerk is ordered to provide copies of this order to all counsel.

Dated July 23, 2021.

Marsha J. Pechman
United States Senior District Judge